IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHET R. GILLIAM, )
)
        Plaintiff, )
) CV 04-6219-JE
  v. )
) FINDINGS AND
JO ANNE B. BARNHART, Commissioner of ) RECOMMENDATION
Social Security, )
)
        Defendant. )

MARK MANNING
Cram, Harder, Wells & Baron PC
474 Willamette, Suite 200
Eugene, OR 97401

    Attorney for Plaintiff

KARIN IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

LUCILLE G. MEIS

1 - FINDINGS AND RECOMMENDATION

Office of General Counsel
THOMAS M. ELSBERRY
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

## INTRODUCTION

Plaintiff Chet Gilliam (Gilliam) brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 USC § 405(g). The Commissioner's decision should be affirmed.

## BACKGROUND

Gilliam was born on July 21, 1960. He completed high school and worked as a test driver, automobile mechanic, ready-mix truck driver and construction laborer. Gilliam suffered a work injury to his low back and stopped working on May 6, 1995. He worked again from October 1998 until May 1999 for an automobile dealership. He has not had a job since then, but has worked from his home selling cars, repairing musical instruments and doing electronics work.

In addition to the 1995 work injury, Gilliam experienced a motor vehicle accident in April 1996, injuring his right knee, the small finger of his right hand and his ribs. He had another motor vehicle accident in November 2002.

Gilliam initially alleged disability beginning April 12, 1995, due to back pain. He later amended the alleged onset date to June 1, 1999. He satisfied the insured status requirements for a claim under Title II through December 31, 2001, and must establish that he was disabled on or

before that date to prevail on his claim. 42 USC § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).

Gilliam alleges that he was unable to work between June 1999 and December 2001 due to pain in his back, spine, knee and neck. He alleges that his back was permanently disabled leaving him unable to bend and his knee was permanently damaged, permitting very limited movement and requiring him to walk with a limp. Gilliam also alleges that he has experienced depression since he stopped working.

## **DISABILITY ANALYSIS**

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520. Each step in the process is potentially dispositive. Gilliam challenges the ALJ's evaluation of the evidence and conclusions at steps two, four and five of the sequential process.

At step two, the Commissioner will find the claimant not disabled if the ALJ determines that the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(c). If the claimant's medical condition significantly limits his ability to perform basic work activities, then it is "severe" for the purposes of step two, and the ALJ must proceed to the next step of the sequential process. *Id.*

For the purposes of step four, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR §§ 404.1520(e), 404.1545; Social Security Ruling (SSR) 96-8p.

At step four the Commissioner will find the claimant not disabled if the ALJ determines that the claimant retains the RFC to perform work he has done in the past. 20 CFR § 404.1520(e).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

## **THE ALJ's FINDINGS**

At step two, the ALJ found that Gilliam had degenerative disc disease of the thoracic spine and degenerative joint disease of the right knee which significantly limited his ability to perform basic work activities and met the regulatory definition of "severe." The ALJ found that Gilliam failed to establish a severe mental impairment.

The ALJ assessed Gilliam with the RFC to perform sedentary and light work. At step four, the ALJ found that Gilliam's RFC did not preclude his past work as a test driver. In the alternative, the ALJ proceeded to step five and applied the Medical Vocational Guidelines in 20 CFR Part 404, Subpart P, Appendix 2, to conclude that a significant number of jobs exist that Gilliam remains capable of performing.

The ALJ concluded that Gilliam was not entitled to DIB payments under Title II of the Act because he had not shown that he was disabled at any time before his insured status expired on December 31, 2001.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## DISCUSSION

Gilliam challenges the ALJ's RFC assessment on the grounds that the ALJ improperly discredited Gilliam's testimony and rejected the medical source statement of David C. Stewart, M.D. He also contends that the ALJ improperly evaluated the psychological evidence and erroneously concluded that he has no severe mental impairments. Gilliam argues that these errors lead the ALJ to erroneously conclude that he retains the RFC to return to his past work and/or perform other work in the national economy.

**I.  Credibility Determination**

Gilliam testified that he is unable to work due to pain in the back, spine, right knee and neck. He has difficulty walking any distance or standing for very long. He can drive a car for about one hour, and then must stop and lie down. He has numbness and tingling in his hands, arms and calves. He has experienced depression.

Narcotic pain medications take the edge off the pain, but cause side effects including poor concentration, lightheadedness, dizziness and lack of energy. The pain medications also cause daily headaches which last one to three hours and require Gilliam to lie down.

During a typical day, Gilliam takes his pain medication, drives his child to school and uses the hot tub at an athletic club. He spends most of the time on his back. He wears a back brace most of the time, except at night.

During 1998 and 1999, he worked as a test driver for a car dealership. It was a full time job, but he never worked full time. He missed a day to a day and a half per week due to pain while working there. His wages were paid half by workers' compensation and half by the employer. When the workers' compensation coverage expired, he was fired after the employer complained that he missed too much work.

The ALJ found that Gilliam's testimony was not credible. An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993). *See also Smolen v. Chater*, 80 F3d 1273, 1283 (9th Cir 1996). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or to follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. *Id*. *See also* SSR 96-7p.

The ALJ found that Gilliam's allegations of severe limitations in standing, walking, sitting and lifting were not credible regarding the level of pain and dysfunction asserted. He considered appropriate factors and articulated sufficiently specific reasons that are supported by substantial evidence in the record.

The ALJ pointed out that the objective evidence and clinical findings were minimal. In October 1995, an MRI scan showed a moderate disc protrusion in the thoracic spine. Gilliam had surgery to repair the bulging disc in January 1996. In October 1996, an MRI scan showed that Gilliam's disc rupture was gone and his treating physician did "not see any other significant problems at all." Tr. 244.[1] From then until Gilliam's insured status expired, MRI scans, x-ray studies and bone scans showed only diffuse mild degenerative disc disease.

Clinical findings on physical examination were similarly minimal. Gilliam demonstrated muscle tenderness to palpation of the thoracic region of the back and numbness near the site of the surgery. However, pain behavior was minimal and range of motion, strength, sensation and reflexes

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 8).

7 - FINDINGS AND RECOMMENDATION

were generally normal. He did not have the muscle atrophy that would result from the complete inactivity of a person unable to perform even light and sedentary tasks.

Regarding his right knee, Gilliam's most significant problem before the alleged onset of disability was loss of flexion. This improved greatly by August 1997. In April 2000, he had some flexion limitation, but he was able to walk normally. There is no objective or clinical evidence that this level of function deteriorated before Gilliam's insured status expired.

Gilliam's complaints of neck pain did not begin until after his insured status expired. In April 2000, his cervical range of motion was completely intact, without limitation or discomfort. His neck complaints began after a whiplash injury during a motor vehicle accident in November 2002. Gilliam did not complain to medical providers of frequent headaches during the period that is relevant for his claim.

The ALJ's conclusion regarding the lack of objective evidence is also supported by several physicians who have noted that Gilliam's alleged level of dysfunction is excessive in proportion to the physical findings. These include treating and examining physicians such as Robert McKillop, M.D., Jeremy Abbott, M.D., Joel Seres, M.D., and David Glass, M.D., as well as agency medical consultants who reviewed and summarized Gilliam's records.

The ALJ also relied on Gilliam's routine and conservative treatment history. Gilliam's physicians have treated him with medication, physical therapy and recommendations for increased activity and exercise. Treating sources declined to intervene with more invasive treatments, such as surgery or nerve blocks. In addition, Gilliam's treatment history includes long gaps during which he did not seek any treatment at all.

The ALJ also found that Gilliam failed to follow recommendations that he increase his activity. Gilliam demonstrated a lack of interest in pain programs to wean him from narcotics and promote greater activity.

The ALJ also relied on Gilliam's reported activities that were inconsistent with complete disability. For example, in August 1998, he was working out at the gym three to four times a week. He returned to full-time work from October 1998 to May 1999. These activities predated his amended onset date, but remain relevant because they came after the traumatic events that his alleged disability is based on, *viz.* the work injury to his low back, the surgery on his thoracic spine and the motor vehicle accident that injured his knee, finger and ribs. The ALJ correctly pointed out that the record does not contain any evidence that Gilliam's medical condition deteriorated between the time he was able to work in 1999 and the time his insured status expired. The next significant change in his medical condition did not occur until he suffered his latest motor vehicle accident in November 2002.

Gilliam also contends the ALJ should not have considered his work in 1998 and 1999, because he was not able to work full-time. Gilliam testified that he missed work frequently and had to lie down during the day. However, his contemporaneous reports do not corroborate this. In March 1999, he told Dr. Stewart that he had been "accommodated with assistance with heavy lifting and difficult jobs." Tr. 470. He did not indicate that he needed or received help with less strenuous light or sedentary jobs. He did not report contemporaneously that he had to lie down on the job or miss work. In addition, contrary to his present testimony that he was fired for missing work, he told Dr. Stewart that he quit his job in May 1999 and was doing well working from home selling cars.

The ALJ could reasonably conclude that Gilliam's testimony was not credible regarding the severity of his limitations in standing, walking, sitting and lifting. The ALJ articulated clear and convincing reasons supported by substantial evidence, and it is evident that the ALJ did not discredit Gilliam arbitrarily. The court should sustain the ALJ's credibility determination.

## II.     Dr. Stewart's Medical Source Statement

Gilliam began treatment with Dr. Stewart in September 1995 for "severe primarily left low back pain which is constant." Tr. 318. He related this to his April 1995 work injury. Gilliam had no objective findings to support a neurological origin for his pain and an MRI scan showed only degenerative changes. Dr. Stewart recommended an aerobic exercise program with brisk walking or bike riding. He warned Gilliam to expect increased pain initially, but assured him that he would not harm himself.

One month later, Gilliam had not engaged in regular aerobic exercise, and Dr. Stewart referred him for a "supervised program of reconditioning and cardiovascular conditioning." Tr. 314. Gilliam began to experience pain between the shoulder blades and an MRI scan revealed protruding disc material in the thoracic spine which was surgically removed in January 1996, as mentioned above.

Meanwhile, Dr. Stewart "exhorted him to increase his level of physical activity." Tr. 309. In March 1996, Dr. Stewart again tried to start him on an exercise program. In April, he was involved in the motor vehicle accident that injured his knee, finger and ribs.

In September 1997, Gilliam had completed training to become an electronics repair person and was "very close to being able to start working full time in that capacity." Tr. 294. He did not find employment in that field, but reported doing electronics work out of his home. He later

reportedly completed training for musical equipment repair and worked independently from home in that field.

Dr. Stewart did not see Gilliam from January to August, 1998. In October 1998, Gilliam was working as a mechanic, and Dr. Stewart's only recommendation "in terms of specific limitations [was] that he avoid repetitive and frequent lifting of anything over 40 lbs. and that he have assistance with lifting anything of this weight or greater." Tr. 286. Gilliam did well with these work restrictions. In March 1999, Gilliam complained of increased pain, but did not mention missing work or lying down during the work day. Dr. Stewart found no objective changes in his condition.

Dr. Stewart next saw Gilliam in August 1999, and did not note any change in his condition. After another four month absence, Dr. Stewart saw Gilliam in December 1999. He again found no changes. Gilliam complained of increased pain and stiffness after shoveling snow in January 2000. Dr. Stewart then saw Gilliam in July 2000, again without noting any change.

In September 2000, Dr. Stewart wrote a letter regarding Gilliam's functional limitations, including the following:

> His tolerance for sitting is impaired because of his back pain, as is his tolerance for standing, lifting, bending and twisting; his leg further impacts this. It is anticipated that if he were to be involved in any type of gainful employment that required prolonged sitting, walking or standing that he would very likely miss several days of work per month due to his degree of discomfort and intolerance of these activities.

Tr. 462.

In August 2001, Dr. Stewart wrote a similar letter in support of Gilliam's present claim, stating as follows:

> He is significantly limited in terms of his ability to sit or stand for any period of time, to do any significant lifting or any prolonged repetitive use of his upper extremities.

Tr. 472.

In December 2002, Dr. Stewart completed a form letter prepared by Gilliam's attorney, in which he opined that Gilliam's symptoms were not disproportionate in severity or duration to what would be expected based on his medically determinable impairments. He opined that Gilliam had been unable to perform sedentary work on a sustained basis since his motor vehicle accident in April 1996.

The ALJ rejected Dr. Stewart's opinion in favor of other evidence in the record, including the medical evidence summarized by the Disability Determination Services reviewing physicians. The ALJ can reject the opinion of a treating physician in favor of the conflicting opinion of another treating or examining physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002) quoting *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ may reject it only for clear and convincing reasons. *Thomas*, 278 F3d at 956-57.

Dr. Stewart's opinion that Gilliam's symptoms were not disproportionate was contradicted by several physicians. In addition, the severe functional limitations he proposed were not supported by other physicians or by the record as a whole. The ALJ pointed out that Dr. Stewart's own treatment records contradicted his opinion. In October 1998, Dr. Stewart opined that Gilliam's only work limitation was to avoid frequent repetitive lifting of objects over 40 pounds. This far exceeds the limitations that define light and sedentary work. 20 CFR § 404.1567.

Dr. Stewart's opinion was contrary to Gilliam's demonstrated ability to sustain full-time work activities from October 1998 to May 1999. While Gilliam now describes missing work frequently and needing to lie down during the work day, this is not supported by his own contemporaneous reports. While he was working, he told Dr. Stewart that he was doing well as long as he had assistance with heavy lifting and difficult jobs. Dr. Stewart did not make any findings that would indicate that his ability deteriorated suddenly after doing this work. Indeed, Gilliam later reported that he had completed training programs and was working from home selling cars, repairing musical instruments and doing electrical work.

The ALJ also noted that Dr. Stewart's treatment was conservative and he consistently recommended increased activity. These recommendations were consistent with other medical sources who recommended that Gilliam should be weaned from narcotics, engage in an exercise program and enter a multidisciplinary pain program to extinguish exaggerated pain complaints.

Finally, the ALJ pointed out that Dr. Stewart's opinion relied on Gilliam's subjective complaints which he found not fully credible. An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaint of disabling pain which the ALJ has already properly discounted. *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989); *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).

In summary, the ALJ articulated legally adequate reasons supported by substantial evidence for discounting Dr. Stewart's opinion. The court should not disturb the ALJ's evaluation of Dr. Stewart's medical source statements.

### III. Mental Impairments

Gilliam contends that the ALJ failed to properly assess his mental impairments. He relies on the psychiatric examination performed by David Glass, M.D., on April 20, 2000, at the request of SAIF Corporation. Dr. Glass reviewed Gilliam's medical history, including complete treatment records, imaging reports and evaluations for the period from 1995 to 2000. He noted that a number of treating clinicians had expressed concerns about Gilliam's long-term narcotic use.

Dr. Glass reviewed a psychiatric evaluation from 1997 in which Gilliam completed an MMPI-2 personality inventory.

> My read on the test results from Dr. Bartol would indicate the MMPI-2 demonstrated hysterical psychodynamics and that psychological factors would be anticipated to be strongly involved in Mr. Gilliam's subjective pain complaints.

Tr. 345.

Dr. Glass conducted a two-hour interview during which Gilliam "[sat] relatively comfortably" and "[did] not appear to be in significant pain." Tr. 348. He demonstrated good social skills, coherent speech and logical thought processes. Dr. Glass found him "quite articulate." *Id.* There was no evidence of personality deterioration and Gilliam denied anxiety and depression symptoms. Gilliam reported low energy and poor concentration due to narcotic use.

Dr. Glass re-administered the MMPI-2 and interpreted Gilliam's scores as follows:

> There are marked elevations in the clinical scales that reflect preoccupation with somatic symptoms and the psychodynamics of individuals who convert bothersome emotional feelings into preoccupation with physical symptoms or somatic complaints.
>
> Individuals with Mr. Gilliam's testing would be overly focused on physical complaints and would be anticipated to use such to manipulate others. . . They would be anticipated to deal with conflict, stress or bothersome emotional feelings by developing physical symptoms or over-focusing on same.

Tr. 350.

Dr. Glass then found that "the most appropriate psychiatric diagnosis" would be Pain Disorder, Opioid Dependence and Personality Disorder. Dr. Glass opined that Gilliam's "subjective pain complaints and disability are not in keeping with the degree of objective physical findings." He opined that opioid dependence was an appropriate diagnosis because of "long-standing and increasing use of narcotic pain medication" and noted concerns that Gilliam "uses his subjective pain complaints as a way of justifying and obtaining narcotics." Tr. 351.

Dr. Glass concluded that the first step in treating Gilliam would be to discontinue narcotic pain medications. He stressed the importance of engaging in activities and physical exercise and returning to work. He did not identify any limitations in mental function that would affect Gilliam's ability to perform basic work activities.

Gilliam contends that his pain disorder causes significant distress in social and occupational functioning. This argument is refuted by Dr. Glass's evaluation, in which he found that Gilliam has good social function and should not be treated as an invalid. Indeed, Dr. Glass recommended an early return to work.

Gilliam alleges that his social and occupational functioning were limited by his pain disorder, because pain required him to lie down during the day. In this argument, Gilliam asserts essentially physical symptoms for his mental disorder, rather than impairment of his ability to perform basic mental work activities, such as understanding, carrying out and remembering simple instructions, using judgment, responding appropriately to supervision, interacting appropriately with coworkers, and so forth. *See* 20 CFR § 404.1521(b).

In any event, the ALJ discredited Gilliam's claim that pain required him to lie down during the day for reasons that are equally valid whether the pain has a physical or psychological basis. Gilliam demonstrated that he could do light and sedentary work from October 1998 to May 1999, and there is no basis to conclude that his ability diminished thereafter for either physical or psychological reasons.

The ALJ found Gilliam had no more than slight limitations in concentration, persistence and pace. It is worth noting that Gilliam attributes these slight deficits to narcotic pain medications which Dr. Glass believes he should discontinue. The ALJ found no evidence in the record of cognitive deficits or social difficulties, other than domestic issues between Gilliam and his wife. Similarly, there is no evidence that Gilliam experienced episodes of decompensation. In addition, Gilliam has never sought or required mental health treatment.

Based on the foregoing, the ALJ performed a reasonable evaluation of the evidence of mental impairments and his conclusion is supported by substantial evidence. Even if Gilliam's interpretation of the record is also reasonable, the ALJ's conclusion must be sustained. *Andrews*, 53 F3d at 1039-40.

## **CONCLUSION**

For the reasons described, the errors Gilliam asserts are not tenable. The ALJ articulated a legally sufficient basis for discrediting Gilliam's testimony and discounting Dr. Stewart's disability opinion. The ALJ properly evaluated the evidence and his conclusion that Gilliam failed to establish that he suffers from severe impairment of any basic mental function is supported by substantial evidence. It follows that the ALJ's RFC assessment was based on correct legal standards and

supported by substantial evidence in the record as a whole. Gilliam does not assert error in the ALJ's evaluation of the vocational evidence or application of the Medical-Vocational Guidelines.

## **RECOMMENDATION**

Based on the foregoing, the ALJ's determination that Gilliam did not suffer from a disability before December 31, 2001, and is not entitled to benefits under Title II of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision should be affirmed and the case should be dismissed.

## **SCHEDULING ORDER**

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due November 1, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objections. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

IT IS SO ORDERED.

DATED this 14th day of October, 2005.

/s/ John Jelderks
John Jelderks
United States Magistrate Judge